IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGG SMITH,<br>MICHAEL NOWAK,<br>JEFFREY RUFFO, and<br>CHRISTOPHER JORDAN,<br><br>      Defendants. | Case No. 19-cr-00669<br><br>Hon. Edmond E. Chang |

**DEFENDANTS' MOTION *IN LIMINE* FOR A CAUTIONARY INSTRUCTION THAT COMPLIANCE POLICIES ARE DIFFERENT FROM LAW**

**KOBRE & KIM LLP**

111 West Jackson Boulevard
Chicago, IL 60604

*Counsel for Gregg Smith*

**PETRILLO KLEIN & BOXER LLP**

655 Third Avenue
New York, NY 10017

*Counsel for Jeffrey Ruffo*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP,**

One Manhattan West
New York, NY 10001

155 North Wacker Drive
Chicago, IL 60606

*Counsel for Michael Nowak*

**AKIN GUMP STRAUSS HAUER & FELD LLP**

One Bryant Park
New York, NY 10036

**MOLOLAMKEN LLP**

300 North LaSalle Street
Chicago, IL 60654

*Counsel for Christopher Jordan*

At trial, we expect the government to offer internal JPMorgan compliance policies, training decks, and attestations from various periods of time during the eight-and-a-half year "Conspiracy Period" alleged in the Superseding Indictment (ECF No. 52).[1] We likewise expect the government to present testimony from compliance witnesses who will testify, in substance, that spoofing was against their institutions' respective compliance policies at least as far back as 2008. In response, the Defendants anticipate presenting their own compliance evidence and pursuing various lines of cross-examination with the compliance witnesses.

Although compliance evidence may be relevant to the Defendants' state of mind, the Court should issue a cautionary instruction, along the lines of the instruction in *United States v. Flotron*, that compliance materials are not a substitute for the law, and that evidence of a violation of compliance policies does not necessarily mean that there was a violation of law. As courts have recognized, companies often adopt compliance standards that are different, and broader, than applicable law. The question for the jury is not whether the Defendants adhered to JPMorgan's internal compliance policies; rather, the question is whether they broke the law. The proposed jury instruction from *Flotron* would mitigate the risk of jury confusion on this critical point.

The government does not oppose the principle that the Court should give a cautionary instruction, but the parties do not agree on the language of the instruction to be given.

A. Background

In prior spoofing trials, the government has presented evidence of compliance policies and training materials, in an effort to establish that the defendants knew that their behavior was

---

[1] With respect to Mr. Jordan only, we expect the government to offer similar compliance evidence from Credit Suisse and First New York Securities.

1

wrongful. Specifically, the government has presented testimony from compliance officers, *see* Jury Trial Transcript, Vol. IV, at 1177–1224, *United States v. Vorley*, No. 18 CR 35, ECF No. 343 (N.D. Ill. Sept. 17, 2020) ("*Vorley* Tr. Vol. IV") (direct examination of Deutsche Bank compliance officer Michael Koplowitz); Jury Trial Transcript, Vol. III, at 698–727, *United States v. Flotron*, No. 3:17CR220 (JAM), ECF No. 231 (D. Conn. Apr. 19, 2018) ("*Flotron* Tr. Vol. III") (direct examination of UBS compliance officer James Oates); language from compliance policies and bulletins, *see Vorley* Tr., Vol. IV, at 1208–12, 1217–24; *Flotron* Tr., Vol. III, at 709–711; and evidence of compliance training that was provided to traders, *see Vorley* Tr., Vol. IV, at 1181–93, 1215–16; *Flotron* Tr., Vol. III, at 707–712, 714–719. In its main and rebuttal summations in *Vorley*, the government highlighted the compliance evidence when arguing to the jury that the defendants acted with criminal intent. *See* Jury Trial Transcript, Vol. VII, at 2059:7–9, 2061:8–14, *United States v. Vorley*, No. 18 CR 35, ECF No. 346 (N.D. Ill. Sept. 22, 2020) ("*Vorley* Tr. Vol. VII") ("Let me give you three reasons, ladies and gentlemen, that show you that these defendants acted with an intent to cheat or deceive somebody else out of money or property . . . Reason No. 3: It was against the rules . . . The rules were clear. Both Scheerer and Koplowitz testified that this practice of spoofing was prohibited by the bank and the CME, respectively."); *see also id.* at 2061–63, 2187–88; *see also* Jury Trial Transcript, Vol. VI, at 1398:1–16, *United States v. Flotron*, No. 3:17CR220 (JAM), ECF No. 234 (D. Conn. Apr. 24, 2018) ("*Flotron* Tr. Vol. VI") ("He's not sending a chat to his boss about spoofing after Dodd-Frank is in effect, after they'd gotten these compliance materials specifically saying that spoofing is unlawful . . . And Mr. Chan told you why he felt comfortable sending that chat, using that word, which by October 2012 absolutely, even the words -- forget about the practice -- even the word, everyone knew was bad. They'd taken compliance trainings on it by that point.").

2

In the instant case, the government has likewise produced extensive compliance materials in discovery, including compliance policies, training materials, and attestations. In addition, the government has produced witness statements and grand jury testimony from compliance officers expressing the view that spoofing was against their respective institutions' compliance policies as long ago as 2008, well before the July 2011 effective date of the Dodd-Frank Act. *See* Declaration of James J. Benjamin, Jr. in Support of Defendants' Motion *in Limine* for a Cautionary Instruction ("Benjamin Decl."), Ex. A at 18–27; *id.* at 23:4–7 ("Q. In fact, whether by the name spoofing or not, was this conduct prohibited for North American metals traders at this point? A. Absolutely."); *id.* at 26:15–27:1 ("[T]his doesn't use the word spoofing. Is this the prohibition on manipulative [trading] that would have applied to precious metals traders? A. Absolutely. This prohibition applied to all trading personnel. Q. Over the years, Mr. Nakkab, were there other policies promulgated by JPMorgan that prohibited manipulative and deceptive trading? A. Of course."); *see also* Benjamin Decl., Ex. B at 3 ("The conduct itself was never permitted at CS, even prior to Dodd-Frank because it would have created a false or misleading appearance of trading in the particular market."); *id.* ("Both versions of the CS compliance manuals prohibit the publication of fictitious market data. A bid or an offer which was not bona-fide was the submission of an order which was not intended to be executed by the trader who submitted the order. These policies would have included electronic exchanges as well. This was conduct which was later expressively [sic] covered under the spoofing definition of Dodd-Frank. CS would have prohibited and viewed the same type of conduct as market manipulation.").

### B. Discussion

Internal compliance policies instituted at JPMorgan, Credit Suisse, and First New York Securities do not constitute federal criminal statutes. "The definition of the elements of a

criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *United States v. Marzook*, 383 F. Supp. 2d 1056, 1068 (N.D. Ill. 2005) (St. Eve, J.) (quoting *Liparota v. United States*, 471 U.S. 419, 424–25 (1985)). Internal policy documents such as compliance manuals and trainings may endeavor to set an organization's aspirational compliance objectives, and outline guidance for employees in achieving those objectives. But internal compliance departments do not promulgate federal law. *See United States v. Mix,* No. 12-CR-171 (SRD), 2014 WL 2625034, at *7 (E.D. La. June 12, 2014) (court instructed jury that, to the extent employees were advised by their employer that certain conduct "could expose an employee to criminal prosecution or punishment, I am instructing you that such statements are not statements of the applicable law."); *see also* Trial Tr., at 274:17-275:14, *United States v. Shapiro*, No. 3:15-cr-155, ECF No. 451 (D. Conn. May 9, 2017), ("It's not a question of what was in the mind of a committee at Nomura that sat down to put together an aspirational statement that might appeal to customers. We're talking about the line that separates criminal from non-criminal.").

In *Flotron*, the District Court delivered a limiting instruction that was crafted to ensure that the jury would consider compliance evidence only insofar as it was relevant to the defendant's intent, and to mitigate the risk that the jury might convict the defendant based on any apparent violation of bank policies:

> You've heard evidence in this case regarding UBS's internal training and compliance policies. Now, these policies are not a substitute for the law. Companies adopt compliance policies for any number of reasons, and they impose different requirements on their employees than the law imposes. Therefore, even if you were to find that Mr. Flotron or any alleged coconspirators violated UBS's internal policies, that does not necessarily mean that there was a violation of a law. You may consider UBS's compliance policies solely as it may affect your consideration whether Mr. Flotron and any alleged coconspirators acted with willful intent to fraud during the course of the charged conspiracy period.

*Flotron* Tr., Vol. VI, at 1320:19–1321:6.[2]  We respectfully submit that this Court should deliver a substantially similar instruction.

---

[2]  In *Vorley*, Judge Tharp delivered a more abridged instruction:

> You have also heard evidence about Chicago Mercantile Exchange (CME) rules and Deutsche Bank policies governing market conduct. Evidence that a defendant engaged in spoofing or violated CME rules or Deutsche Bank policies is not, standing alone, sufficient to convict a defendant. Rather, the government must prove all of the elements of wire fraud and conspiracy to commit wire fraud beyond a reasonable doubt to convict a defendant on those charges.

*Vorley* Tr., Vol. VII, at 2205:9–17.  We respectfully submit that the *Flotron* instruction is preferable because it expressly provides that training and compliance policies "are not a substitute for the law" and that compliance evidence may *only* be considered in determining intent, whereas the *Vorley* instruction provides that the compliance policies *alone* are not sufficient to prove guilt, suggesting that a violation of the policies might nonetheless be relevant to assessing whether the at issue crimes were committed.

5

Dated July 9, 2021

/s/ Jonathan D. Cogan
Jonathan D. Cogan
Sean S. Buckley
Leanne Bortner
KOBRE & KIM LLP
111 West Jackson Boulevard
Chicago, IL 60604
(212) 488-1206

*Counsel for Gregg Smith*

/s/ Guy Petrillo
Guy Petrillo
Daniel Z. Goldman
PETRILLO KLEIN & BOXER LLP
655 Third Avenue
New York, NY 10017
(212) 370-0331

*Counsel for Jeffrey Ruffo*

Respectfully submitted,

/s/ David Meister
David Meister
Jocelyn E. Strauber
Chad E. Silverman
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-2100

William E. Ridgway
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, IL 60606
(312) 407-0449

*Counsel for Michael Nowak*

/s/ James J. Benjamin, Jr.
James J. Benjamin, Jr.
Parvin D. Moyne
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

Megan Cunniff Church
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 450-6716

*Counsel for Christopher Jordan*